STATE of Tennessee

v.

Joel Richard SCHMEIDERER.

Supreme Court of Tennessee,
at Nashville.

June 4, 2010 Session.

Sept. 14, 2010.

Claudia S. Jack, District Public Defender; Shipp Weems and Michelle VanDeRee, Assistant Public Defenders, Columbia, Tennessee, for the appellant, Joel Richard Schmeiderer.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; Joel Douglas Dicus and Patrick Butler, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

JANICE M. HOLDER, C.J., delivered the opinion of the court, in which CORNELIA A. CLARK, GARY R. WADE, WILLIAM C. KOCH, and SHARON G. LEE, JJ. joined.

In this capital case, the defendant, Joel Richard Schmeiderer, was convicted of first degree premeditated murder in connection with the strangling death of a fellow inmate. The jury imposed a sentence of death for the murder based on two aggravating circumstances. The Court of Criminal Appeals affirmed. On automatic appeal pursuant to Tennessee Code Annotated section 39-13-206(a)(1), we designat-

ed the following issues for oral argument:[1] 1) whether the trial court abused its discretion by denying the defendant's motion for a second continuance; 2) whether this denial of a continuance violated the defendant's constitutional right to present mitigation evidence during the sentencing phase; 3) whether the trial court erred by allowing the State to introduce into evidence and argue a non-statutory aggravating circumstance during the sentencing phase; 4) whether the prosecutor's closing argument during the sentencing phase constituted plain error mandating reversal; and 5) whether the sentence of death is disproportionate or invalid under the mandatory review of Tennessee Code Annotated section 39–13–206(c)(1). Having carefully reviewed the record and relevant legal authority, we conclude that none of the errors alleged by the defendant warrant relief. With respect to issues not herein specifically addressed, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

## FACTS AND PROCEDURAL HISTORY

At the guilt phase of the trial, the State presented proof that on the evening of July 11, 2001, the victim, Tom Harris, an inmate at the South Central Correctional Center in Clifton, Tennessee, was strangled to death in his cell. The victim's cell was located on the second floor of a "pod." The cells belonging to the defendant, Joel Richard Schmeiderer, and codefendant, Charles Sanderson, were on the first floor in that pod. Inmates were permitted access to cells within their pod.

The victim was last seen alive in his cell at approximately 7:00 p.m. when Jeremy Means, a correctional officer, delivered an educational pass for the victim's cellmate, Robert Craig. Shortly after 8:00 p.m., inmates returned to their pod for a head count after a period of recreation. Officer Means could not see the victim's cell from his post at the entry to the pod. Daniel Pollen, who was housed next to the victim's cell, testified that he heard loud "thumping" noises coming from the victim's cell at approximately 8:10 p.m. Another inmate, Douglas Ford, testified that he saw the defendant and Mr. Sanderson quickly leave the victim's cell at approximately 8:20 or 8:25 p.m. A few minutes later, Mr. Craig went to the victim's cell. Because Mr. Craig had been housed in the victim's cell for only one night, he did not yet have a key. The victim and Mr. Craig had been using a piece of cardboard to prevent the cell door from locking, but the cardboard was not in the door. The victim did not answer when Mr. Craig pounded on the locked door.

Officer Means responded to Mr. Craig's call for help at 8:30 p.m. Officer Means unlocked the cell and found the victim face down on the floor with a sock around his neck. The cell was in disarray. There was blood on the sock, the victim's shirt, the television, the outside door handle, and a towel in the sink. The defendant's cell was located at the bottom of a stairway, and a blood trail led from the victim's cell to the top of the stairway.

The defendant's cellmate, Jeffrey Hubert, testified the defendant met in their cell with Mr. Sanderson on the day of the murder. The men stopped talking each time Mr. Hubert entered the cell. When the guards locked down the prison at 8:45

**1.** "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup.Ct. R. 12.2.

p.m., Mr. Hubert returned to the cell. The defendant told him that "it was going to be a long night." The defendant also indicated that the guards would find blood on his pants because he had injured himself on the basketball court that day. Mr. Hubert saw the defendant remove a shirt from a plastic bag and use his teeth to tear off a part of the shirt containing a blood stain. The defendant flushed the bloody material down the toilet. The blood-stained pants and blood-stained torn shirt were found in subsequent searches of the defendant's cell.

Mr. Hubert asked the defendant whether "he had stuck the old man upstairs." The defendant replied, "The man hadn't been stuck. He'd been strangled to death." The defendant told Mr. Hubert that the "old man put up a fight" and "bit Chuck [Mr. Sanderson] on the hand." The defendant also remarked that the victim was a "baby raper" whose sentence was not long enough and that the killing would get the defendant back into court, giving him an opportunity to escape.

Two agents from the Tennessee Bureau of Investigation ("TBI") interviewed the defendant after he waived his *Miranda* rights. When asked to explain what happened, he responded, "Well, you're the investigators, you tell me." The agents then related to him their theory that he and Mr. Sanderson had gone into the victim's cell. A struggle ensued during which Mr. Sanderson's finger was bitten and bled. The defendant punched the victim and ultimately strangled him with a sock. In the process, the defendant's clothes were stained with both the victim's blood and Mr. Sanderson's blood. Essentially confirming this theory, the defendant stated, "That's pretty much it." When asked if he was bothered by taking a man's life, the defendant laughed, shrugged his shoulders, and said, "No."

Dr. Charles Harlan, the pathologist who performed the autopsy of the victim, determined that the cause of death was strangulation. In addition to scrapes and bruises, the victim's body had a line around the neck with broken capillaries, indicating that an object was tied or wrapped around the neck tightly.

Serological testing showed that Mr. Sanderson's blood was on the television in the victim's cell, the outside door handle, and the towel in the sink. The sock used to strangle the victim contained both his and Mr. Sanderson's blood. The defendant's shirt had the victim's blood on it. The defendant's pants contained both the victim's and Mr. Sanderson's blood.

In defense, the defendant presented the testimony given by Mr. Sanderson at his separate trial. In that prior testimony, Mr. Sanderson stated that on the evening of the murder he went to the victim's cell to beat up the victim for disrespecting Mr. Sanderson earlier that day. The defendant stayed outside the victim's cell as a lookout. Mr. Sanderson knocked the victim against the wall and hit him several times in the face after he bit Mr. Sanderson's finger. Mr. Sanderson cleaned his finger at the sink, wiping his hand on the towel. When he left the cell, the victim was alive, sitting on the bunk. Mr. Sanderson and the defendant then went their separate ways. Mr. Sanderson could not explain how his blood got on the defendant's pants or on the sock around the victim's neck.

The jury convicted the defendant of first degree premeditated murder. A sentencing hearing was conducted to determine punishment.

During the sentencing phase, the State presented the testimony of the warden of the South Central Correctional Center, who confirmed that the defendant was an

inmate there on the day of the murder. The State also introduced proof that in August 1999 a jury convicted the defendant of first degree premeditated murder and two counts of attempted first degree premeditated murder and that he pleaded guilty to aggravated assault in December 1999.

Through the testimony of the two victims of the defendant's attempted murders and the wife of one of those victims, the facts underlying these convictions and the murder conviction were presented. Their testimony showed that on October 9, 1998, when the defendant was eighteen years old, he argued with two men at a gas station. When the two men left, the defendant and his companions gave chase, shooting at the men's truck. The chase ended when the defendant's car rammed the truck. The two men got out of the truck and ran behind a nearby house. The defendant approached the owner of the house and tried to shoot him, but the gun misfired. When the two men returned to the truck, the defendant fired the gun at them. One of the men was fatally shot and fell against the house. The defendant tried to shoot him again, but the gun misfired.

In mitigation, the defendant presented the testimony of Joseph Cody Uttmor, who was with the defendant when he committed the earlier murder and attempted murders. Mr. Uttmor explained that he and the defendant were high on Xanax at the time.

The defendant also presented the testimony of three family members. His mother testified that she never married the defendant's father, who showed no affection toward the defendant. The defendant started getting into trouble in high school. After he was sent to an alternative school, he began stealing drugs, money, and guns. He entered a juvenile facility at age fifteen and remained there until his eighteenth birthday. The defendant's maternal aunt and twelve-year-old sister testified that they loved the defendant, and they asked the jury not to sentence him to death.

Three witnesses testified about the defendant's more recent conduct at Riverbend Maximum Security Prison. Mickey Sawyers, a case manager at Riverbend, testified that the defendant had remained discipline-free during the prior two years. Ron Mosby and Adam Olsen, ministerial volunteers at Riverbend, testified that the defendant, who was baptized in February 2004, had much to offer in life and could be fruitful even in the prison environment.

Finally, the defendant presented the testimony of Dr. Ann Marie Charvat, a mitigation specialist. She testified regarding her review of the defendant's school, medical, juvenile, and prison records. Although the defendant was evaluated at a psychiatric facility when he entered the juvenile justice system, he never received the recommended treatment for drug addiction. Just a few months after he was released from state custody, he committed his earlier murder and attempted murders. The "theme" of the defendant's life was exclusion—exclusion from his father's family, exclusion from a regular school environment, and exclusion from a normal teenage life. Dr. Charvat believed that the defendant suffered from a cognitive emotional disorder resulting from "extreme psychological abuse."

Based on this proof, the jury found that the State had proven beyond a reasonable doubt both statutory aggravating circumstances: the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence; and the murder was committed by the defendant while the defendant was in lawful custody or in a place of lawful confinement. *See*

Tenn.Code Ann. § 39–13–204(i)(2), (8) (2006 & Supp.2009). The jury further found that the State had proven beyond a reasonable doubt that the statutory aggravating circumstances outweighed any mitigating circumstances. As a result, the jury sentenced the defendant to death for the murder of Tom Harris.

## ANALYSIS

### Denial of Continuance

■ The defendant asserts that the trial court abused its discretion by denying his motion for a continuance because his attorneys did not have adequate time to review the transcript of Mr. Sanderson's trial and because his experts needed additional time to complete medical testing and evaluations. The defendant further argues that the trial court's ruling violated his right to present a defense under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The State maintains that the trial court properly declined to grant a second continuance.

On July 26, 2001, the defendant was indicted. On August 16, 2001, the State filed a notice of intent to seek the death penalty. On August 9, 2002, the trial court granted the defendant's *ex parte* motion for funds for a mitigation assessment. The case was set for trial on February 3, 2003. On January 9, 2003, the defendant moved for a continuance, stating that, although his medical and school records had been obtained, his records from various correctional institutions had not. The trial court granted the continuance, and the case was reset for trial on May 3, 2004. On March 11, 2004, the trial court granted the defendant's *ex parte* motion for additional funds for his mitigation expert, Dr. Charvat, and funds for a psychiatric expert, Dr. Stephen Montgomery. On April 28, 2004, less than a week before the trial

date, the defendant filed a motion for a continuance, citing the need for more time to conduct neurological and neuropsychological evaluations. On the next day, April 29, 2004, the defendant moved for a continuance on the additional ground that he had not received a transcript of Mr. Sanderson's trial.

On May 3, 2004, the trial court held a hearing on the motion for a continuance. Dr. Montgomery testified that he had evaluated the defendant for ninety minutes on April 20, 2004. The only significant finding from that evaluation was that the defendant inappropriately approached his situation in "a somewhat nonchalant and jovial way instead of a serious way." Discussing the defendant's medical history, Dr. Montgomery stated that the defendant "suffered a possible head injury in 1982, when he fell down the stairs breaking his nose." In 1995, the defendant had an "abnormal" electroencephalogram ("EEG"), which "could possibly mean that he has some impairment or dysfunction in his brain." Dr. Montgomery testified that he could not complete his evaluation of the defendant without further neurological and neuropsychological testing, including a repeat EEG and a magnetic resonance imaging ("MRI") study of his brain. On cross-examination, Dr. Montgomery acknowledged that an abnormal EEG did not necessarily indicate brain damage or abnormality.

Dr. Charvat, the defendant's mitigation expert, testified that she had been retained over a year before the hearing. She had interviewed the defendant and his close family but no other witnesses. Although she considered additional interviews to be "necessary," she had only "identified, potentially, what [she was] going to need to substantiate." She stated that her mitigation evaluation could not be completed

without a complete psychological evaluation.

On May 4, 2004, the day voir dire began, the trial court entered a written order denying the motion for a second continuance. The trial court observed that the case had been pending for nearly three years. The trial court found it noteworthy that both experts spoke in terms of conjecture and possibilities: that a brain injury "could" exist and that such a condition "could" be used as mitigation. The trial court also found that none of the evidence being developed by the experts was pertinent to the guilt phase of the trial. The trial court therefore found that the experts had adequate time to develop any further mitigation evidence in the two weeks before the sentencing phase would possibly begin. Finally, the trial court found that on May 3, 2004, defense counsel had been provided with Mr. Sanderson's trial testimony and therefore would have adequate time to review it before the guilt phase would begin. The record reflects that defense counsel received the remainder of the transcript two days before the guilt phase began on May 10, 2004.

The record does not reflect whether defense counsel continued to pursue funding for further mental evaluations after the motion for a continuance was denied. Dr. Montgomery had estimated that such evaluations, including an EEG, MRI, neurological examination, and neuropsychological testing, would cost $10,627 and take eight to ten weeks to complete. In the order denying the continuance, the trial court suggested that, if the funding issue with the Administrative Office of the Courts could be resolved expeditiously, defense counsel should locate a different doctor whose schedule was more accommodating.

The granting of a continuance lies within the sound discretion of the trial court. *State v. Odom,* 137 S.W.3d 572, 589

(Tenn.2004). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *State v. Hines,* 919 S.W.2d 573, 579 (Tenn.1995). A defendant who asserts that a denial of a continuance constitutes a denial of Sixth Amendment or due process rights must establish actual prejudice. *Odom,* 137 S.W.3d at 589.

The record does not support the defendant's argument that additional time was needed to review the transcript of Mr. Sanderson's trial. Seven days before the guilt phase began, defense counsel received the portion of the transcript containing Mr. Sanderson's testimony. The defendant introduced that testimony in his defense. Although the remainder of the transcript was not provided to defense counsel until two days before the guilt phase began, the defendant has failed to indicate what portion of the remainder of the transcript was necessary to his defense. We agree with the trial court that defense counsel had adequate time to review the transcript of Mr. Sanderson's trial.

We also agree with the trial court that the defendant had adequate time to complete any necessary mental evaluations in the nearly three years that the case had been pending. As the trial court found, Dr. Montgomery's testimony at the hearing on the motion for a continuance was speculative. The defendant did not call Dr. Montgomery to testify during the guilt or sentencing phase of the trial. The defendant has failed to demonstrate that Dr. Montgomery's testimony would have been favorable to the defense. Dr. Charvat testified for the defense during the sentencing phase. The defendant has failed to show how a continuance would have signif-

icantly enhanced her testimony. The circumstances of this case are similar to those in *Odom* in which a defense expert asserted that his psychiatric evaluation could not be completed without a neuropsychological evaluation. *Id.* at 589–90. We upheld the trial court's denial of a continuance. *Id.* at 590. As in *Odom,* there is no indication in this case that the defendant was denied a fair trial or that the result of the trial would have been different had a continuance been granted. Accordingly, the defendant is not entitled to relief on this issue.

### Right to Present Mitigation Evidence

■ The defendant contends that the trial court's denial of a second continuance also violated his constitutional right to present mitigation evidence. The State counters that the trial court did not exclude any mitigation evidence.

■■ Exclusion of relevant mitigating evidence from a sentencing hearing violates the Eighth Amendment to the United States Constitution. *Skipper v. South Carolina,* 476 U.S. 1, 8, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). When a trial court erroneously excludes mitigating evidence in the sentencing phase of a trial, the State bears the burden of proving beyond a reasonable doubt that the sentence would have been the same even if the excluded evidence had been allowed. *State v. Rimmer,* 250 S.W.3d 12, 24 (Tenn.2008).

We agree with the State that the defendant's claim does not sound under the Eighth Amendment. The trial court did not exclude any relevant mitigating evidence. The defendant chose not to call Dr. Montgomery to testify at the sentencing hearing. Dr. Montgomery's testimony at the continuance hearing was speculative as to whether the defendant suffers from brain damage. The defendant has failed to show that additional time would have altered Dr. Montgomery's findings such that the defendant would have presented Dr. Montgomery as a witness at the sentencing hearing. Similarly, the defendant has not demonstrated how the denial of a continuance restricted Dr. Charvat's testimony.

The record contains nothing more to substantiate the claim of the defendant that he suffers from brain damage. No further proof was presented on the issue at the hearing on the motion for a new trial, which was held three years after the trial. We conclude that the trial court's denial of a second continuance neither effectively denied Dr. Montgomery the chance to testify nor restricted Dr. Charvat's testimony. Accordingly, we hold that the trial court's ruling did not violate the defendant's constitutional right to present mitigating evidence during the sentencing phase.

### Non–Statutory Aggravating Circumstance

■ The defendant contends that the trial court erred in admitting into evidence Mr. Sanderson's prior convictions. The defendant argues that this evidence improperly allowed the State to argue as a non-statutory aggravating circumstance that the defendant deserved the death penalty because his criminal record was worse than Mr. Sanderson's. The State asserts that admission of Mr. Sanderson's prior convictions was a mere evidentiary error and, even if the error was of constitutional dimension, it was harmless beyond a reasonable doubt.

During the guilt phase of the defendant's trial, testimony from a TBI agent established that Mr. Sanderson had been convicted of first degree premeditated murder in connection with the victim's death. The trial court allowed the defendant to introduce into evidence the judg-

ment document for Mr. Sanderson's conviction, but the sentence for his conviction was redacted. Prior to the sentencing phase of the defendant's trial, the trial court granted the defendant's motion to be permitted to introduce Mr. Sanderson's sentence of life without the possibility of parole as a mitigating circumstance. In response, the State requested permission to introduce Mr. Sanderson's prior convictions for burglary, larceny, and armed robbery that had been presented as proof of an aggravating circumstance at Mr. Sanderson's trial. The trial court ruled, again before the sentencing phase began, that the State would be allowed to introduce Mr. Sanderson's prior convictions.

The prosecutor's opening statement at the sentencing phase referred to Mr. Sanderson's sentence and prior convictions:

> Now, also ladies and gentlemen, I'm going to tell you that you will hear, during this phase of the trial, at some point, that the co-defendant, Charles Sanderson, that we've heard so much about here, has already been tried and convicted of first degree murder. The jury in his case gave him life without parole. Okay.
>
> But the rest of the story is, is that— Let me tell you a little bit about what that jury had to consider. That Mr. Sanderson had convictions like burglary, and theft, and armed robbery. No murders. No attempted murders. No aggravated assaults.
>
> And I'm going to submit to you, ladies and gentlemen, that you're dealing with two completely different people here, when you look at those people's background, what their [sic] in prison for, and the big picture of what each one of them deserves. No, it's true, he got life without parole, but he wasn't convicted of murder already.

The defendant objected to this line of argument. The defendant also objected during the sentencing phase when the State introduced in its case-in-chief the judgment documents for Mr. Sanderson's prior convictions for burglary, larceny, and armed robbery. In allowing the State to introduce the documents, the trial court reasoned that the evidence was admissible to rebut the mitigating circumstance of Mr. Sanderson's sentence. There is no indication in the record, however, that the defendant ever offered Mr. Sanderson's sentence as evidence, although the trial court granted permission to the defendant to do so. The prosecutor's closing argument did not refer to Mr. Sanderson's sentence and prior convictions.

In determining whether to impose the death penalty, the jury is limited to consideration of the aggravating circumstances listed by statute. Tenn.Code Ann. § 39–13–204(i). Evidence relevant to the issue of punishment and therefore admissible at a capital sentencing hearing includes "any evidence tending to establish or rebut any mitigating factors." Tenn.Code Ann. § 39–13–204(c). This rebuttal evidence must be relevant to a mitigating factor actually raised by the defendant. *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn. 1979); *cf. State v. Nesbit*, 978 S.W.2d 872, 890 (Tenn.1998) (recognizing that *Cozzolino* does not limit admission of evidence about the nature and circumstances of the crime, including victim impact evidence, even though such proof is not necessarily related to a statutory aggravating circumstance).

In *Cozzolino*, the trial court permitted the State to introduce proof of subsequent crimes on the theory that it was relevant to rebut evidence of mitigating circumstances that might be advanced by the defendant. We held that the trial court erred because "[o]ne cannot rebut a propo-

sition that has not been advanced." 584 S.W.2d at 768. We noted that, while the error admittedly might have been made harmless by the later introduction by the defendant of evidence to which the State's proof of subsequent crimes was relevant in rebuttal, that did not occur. We therefore reversed the verdict of the jury imposing the death penalty and remanded for a new sentencing hearing. *Id.*

As in *Cozzolino,* we conclude that the trial court erred by allowing the State to introduce rebuttal evidence during its case in chief. With regard to whether the error is reversible, however, this case is distinguishable from *Cozzolino.* In this case, the jury had already heard proof of Mr. Sanderson's prior convictions during the guilt phase when the defendant presented the testimony given by Mr. Sanderson during his separate trial. In that prior testimony, Mr. Sanderson acknowledged that he previously had been convicted of burglary, larceny, and armed robbery.

■ Moreover, we do not view the trial court's ruling as effectively allowing the State to enter into evidence and argue a non-statutory aggravating circumstance. The prosecutor's opening statement made clear that proof of Mr. Sanderson's prior convictions would be offered as rebuttal evidence. The prosecutor's closing argument made no mention of this proof. The trial court properly instructed the jury regarding the two statutory aggravating circumstances and gave this admonishment: "You shall not consider any other facts or circumstances as an aggravating circumstance in deciding whether the death penalty or imprisonment for life without the possibility of parole would be appropriate punishment in this case." We conclude that the trial court's error and any impropriety during the State's opening statement did not affect the jury's sentencing determination to the defendant's preju-

dice. *See State v. Chalmers,* 28 S.W.3d 913, 918 (Tenn.2000). We further conclude that, even if the error were considered to be of constitutional dimension, it was harmless beyond a reasonable doubt because the jury had already heard proof of Mr. Sanderson's prior convictions during the guilt phase.

### Closing Argument

■ The defendant asserts that the prosecutor's closing argument during the sentencing phase constitutes plain error mandating reversal. Specifically, the defendant contends that the prosecutor impermissibly argued for specific deterrence. The State maintains that the prosecutor's comments were proper argument about the relevant aggravating circumstances and that, even if improper, the comments did not affect the jury's sentencing decision.

During closing argument, the prosecutor made the following comments:

If you find anybody's at fault, make no mistake about it, [the defendant] brought us all here. He brought us to this place in time. He brought himself to this place in time. They're not really asking you for justice. They're asking you for mercy. He didn't show his victims any mercy. They don't want justice. Because if you do justice, ladies and gentlemen, do justice under the law and give only one punishment for a man that kills, and kills again, and keeps killing.

There is only one punishment left for somebody that you've tried to punish, you've tried to reform, and he keeps on killing. There's only one left. And I am sorry his life has called on all of us to extract [t]his punishment, but make no mistake about it, [the defendant] brings us here. Give him not what he wants now, but what he does.

■ Generally, prosecutors should avoid arguing specific deterrence during the sentencing phase of a capital case because the argument is not relevant to any statutory aggravating circumstances. *State v. Sims*, 45 S.W.3d 1, 15–16 (Tenn. 2001). In this case, the defendant has waived the issue because he did not contemporaneously object to the prosecutor's comments at trial. *See id.* at 16.

■ Moreover, our review of the record convinces us that the prosecutor's comments were not improper under the circumstances of this case. *See State v. Bates*, 804 S.W.2d 868, 882 (Tenn.1991) (holding that the State's future dangerousness argument in direct response to the defendant's mitigating theory, including amenability to treatment and rehabilitation, was not improper under the circumstances of the case). In this case, the defendant presented mitigating evidence that he had remained discipline-free during the two years prior to the sentencing hearing, thus implying that he was amenable to rehabilitation. Therefore, as in *Bates*, the State's future dangerousness argument was relevant to the defendant's mitigation theory regarding amenability to rehabilitation. In addition, the future dangerousness argument in this case was relevant to the State's theory regarding the weight to be given to the aggravating circumstances supported by evidence that the defendant had committed murders both outside and inside prison. *See id.* (observing that the future dangerousness argument may be relevant to an aggravating circumstance).

Even if the argument was improper, any error was harmless because the prosecutor's comments did not affect the jury's sentencing decision. *See State v. Irick*, 762 S.W.2d 121, 131 (Tenn.1988) ("If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment."). In making this determination, we have considered the following: 1) the conduct complained of in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper arguments; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength and weakness of the case. *Chalmers*, 28 S.W.3d at 917. The defendant did not object to the prosecutor's argument and did not ask for a curative instruction. Although the comments about which the defendant complains were an attempt to improperly sway the jury, they were not so exceptionally flagrant as to require reversal. *See State v. Banks*, 271 S.W.3d 90, 132 (Tenn.2008). The cumulative effect of any improper argument and any other errors in the record was far outweighed by the strength of the evidence supporting the jury's finding that the aggravating circumstances outweighed proof of any mitigating circumstances beyond a reasonable doubt. Accordingly, we hold that the prosecutor's closing argument during the sentencing phase does not constitute plain error.

## Mandatory Review

We are bound by statute to review the application of the death penalty to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn.Code Ann. § 39–13–206(c)(1) (2006). Our review of the record confirms that the death sentence in this case was not imposed in an arbitrary fashion.

We also conclude that the evidence supports the jury's findings with respect to the two aggravating circumstances beyond a reasonable doubt. The evidence that the defendant had prior convictions for first degree premeditated murder, aggravated assault, and two counts of attempted first degree premeditated murder supports the jury's finding of aggravating circumstance (i)(2), that the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence. *See* Tenn.Code Ann. § 39–13–204(i)(2). The evidence that the defendant was an inmate at South Central Correctional Center when he committed the murder supports the jury's finding of aggravating circumstance (i)(8), that the murder was committed by the defendant while the defendant was in lawful custody or in a place of lawful confinement. *See* Tenn.Code Ann. § 39–13–204(i)(8).

▇▇ We further conclude that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. "In determining whether the evidence supports the jury's finding, the proper standard is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the aggravating circumstance(s) outweighed the mitigating circumstance(s) beyond a reasonable doubt." *State v. Stephenson*, 195 S.W.3d 574, 593 (Tenn.2006). A rational juror could have found that the (i)(2) and (i)(8) aggravating circumstances outweighed the various mitigating circumstances beyond a reasonable doubt.

▇▇▇ Next, we must determine whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn.Code Ann. § 39–13–206(c)(1)(D). We are mindful of the following principles applicable to proportionality review:

In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

*State v. Hall*, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in identifying and comparing similar cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. *See State v. Bland*, 958 S.W.2d 651, 667 (Tenn.1997). In comparing defendants, we consider the following non-exclusive factors: 1) prior criminal

history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of victim; and 8) capacity for rehabilitation. *See id.*

 The proof in this case showed that the defendant and Mr. Sanderson strangled a fellow inmate to death with a sock. The defendant's stated motives were that the victim was a "baby raper" whose sentence was not long enough and that the killing would get the defendant back into court, giving him an opportunity to escape. The victim, a middle-aged man with no mentioned physical or psychological condition, had done nothing to provoke the defendant.

The defendant, a white male, was twenty-one years old at the time of the murder. He had a prior criminal history, including convictions for first degree premeditated murder, aggravated assault, and two counts of attempted first degree premeditated murder. He showed no remorse for the killing and cooperated minimally with authorities. The defendant presented mitigating evidence that he had a difficult childhood and a history of substance abuse. He has shown the potential for rehabilitation by discipline-free conduct in prison during the two years prior to the sentencing hearing.

Based on an exhaustive review of the record and Tennessee Supreme Court Rule 12 reports, we conclude that the sentence of death imposed in this case is not excessive or disproportionate when compared to the penalty imposed in similar cases. The sentence of death has been upheld in numerous similar cases involving aggravating circumstances (i)(2) and/or (i)(8). *See, e.g., State v. Hugueley,* 185 S.W.3d 356 (Tenn.2006) (murder of middle-aged corrections counselor by inmate; (i)(2), (i)(5) (heinous, atrocious or cruel), (i)(8), and (i)(9) (corrections employee) aggravators); *State v. McKinney,* 74 S.W.3d 291 (Tenn.2002) (murder of off-duty law enforcement officer by twenty-three-year-old male with prior conviction for aggravated robbery; (i)(2) aggravator); *State v. Henderson,* 24 S.W.3d 307 (Tenn.2000) (murder of uniformed police officer by twenty-four-year-old male while in custody with intent of escaping; (i)(8) and (i)(9) (law enforcement officer) aggravators); *State v. Sutton,* 761 S.W.2d 763 (Tenn. 1988) (murder of fellow inmate; (i)(2), (i)(5) (heinous, atrocious or cruel), and (i)(8) aggravators).

We reiterate that "our objective is not to 'search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and to invalidate the aberrant death sentence.'" *State v. Stevens,* 78 S.W.3d 817, 842 (Tenn.2002) (quoting *Bland,* 958 S.W.2d at 665). After reviewing the cases discussed above, and many others not specifically cited, we are of the opinion that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39–13–206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances beyond a reasonable doubt, that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix. The sentence of death shall be carried out as provided by law on the 13th day of September, 2011, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant, Joel David Schmeiderer, is indigent, costs of this appeal are taxed to the State of Tennessee.

## APPENDIX

APPENDIX—Filed September 14, 2010

(Excerpts from the Decision of the Court of Criminal Appeals)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

September 17, 2008 Session

### STATE OF TENNESSEE v. JOEL RICHARD SCHMEIDERER

Direct Appeal from the Circuit Court for Maury County, No. 14488, Jim T. Hamilton, Judge.

No. M2007–01922–CCA–R3–DD— Filed April 9, 2009

**Tenn. R.App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J.C. McLIN, JJ., joined.

Sharon D. Aizer, Columbia, Tennessee (on appeal); Claudia S. Jack, Shipp Weems, and Michelle VanDeRee, Columbia, Tennessee (at trial) for the Defendant, Joel Richard Schmeiderer.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; Mike Bottoms, District Attorney General; Joel Douglas Dicus and Patrick S. Butler, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### [Section II. Analysis]

### B. Voir Dire

The Defendant next argues that the trial court erred during voir dire. Specifically, the Defendant asserts that the trial court erred because: (1) it allowed the State to shift the burden to the Defendant to "put on evidence" of mitigation; (2) it limited his questions, and the phrasing of those questions, of prospective jurors; (3) it struck eleven women without allowing for rehabilitation of those potential jurors and without making a record; (4) it improperly denied the Defendant's request to strike prospective juror Jonathan White for cause; and (5) it improperly excused prospective juror Manual Oskian for cause. The State's response to each of these assertions will be discussed in their respective sections below.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn.Crim.App.1993) (citing *Toombs v. State*, 197 Tenn. 229, 270 S.W.2d 649, 650 (1954)). Thus, the function of voir dire is essential. Voir dire permits questioning by the court and coun-

sel in order to lead respective counsel to the intelligent exercise of challenges. *Id.* (citations omitted). A trial court is vested with great discretion in conducting the selection of a fair and impartial jury. *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993), *cert. denied* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994); *State v. Harris*, 839 S.W.2d 54, 65 (Tenn.1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *see* Tenn. R.Crim. P. 24(a). Thus, this Court must uphold the trial court's ruling unless the defendant establishes the existence of a clear abuse of discretion. *State v. Raspberry*, 875 S.W.2d 678, 681 (Tenn.Crim.App.1993).

### 1. Shifting of Burden to Defendant

 The Defendant claims that the trial court erred when it permitted the State to improperly shift the burden to him to present evidence mitigating against the imposition of the sentence of death by pointing out several times to the jury, and in several ways, that the defense would be presenting such evidence. The State counters that the Defendant did not object until the third day of voir dire and, therefore, cannot complain that the jury impaneled on the first two days was tainted. Further, it asserts that the comments did not shift the burden but rather alluded to the possibility that the defense would bring up mitigating circumstances, which is, in fact, an accurate statement in most cases. Finally, the State contends that the comments are not jury instructions and that the jury was properly instructed that the Defendant did not have the burden of proving a mitigating circumstance.

 The record reflects that the prosecution repeatedly said during the voir dire of prospective jurors that the defense would be presenting evidence of mitigating circumstances. The Defendant did not ob-

ject until the third day of voir dire, and he objected to only one statement, which will be discussed below. According to Tennessee Rule of Appellate Procedure 36(a), relief is not available to a party "who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error." Therefore, a defendant must object contemporaneously to statements by the prosecution that the defendant believes to be legally wrong or misleading. *State v. Alder*, 71 S.W.3d 299, 302 (Tenn.Crim.App.2001). The Defendant has, therefore, waived our review of the statements occurring before and after his objection, statements to which he made no contemporaneous objection.

 In the comment made by the prosecutor to which the Defendant did object, the prosecutor said, "The defense can put on evidence they want to, in this part of the trial. We call them mitigating circumstances. Anything ... they want you to consider about the defendant ... whatever, that they think you need to consider in making this decision." Defense counsel objected, claiming that the prosecutor shifted the burden of presenting mitigating evidence to the Defendant. The trial court ruled that the State had merely told the jury that the Defendant presenting mitigating evidence was a possibility, which is a fact jurors "need to know."

We understand the Defendant's argument to be that the prosecutor, by repeatedly informing the jury that the Defendant can present mitigating evidence, created the expectation that if the Defendant did not present such evidence then there is no evidence mitigating against a sentence of death. In fact, any evidence presented to the jury from the State or the defense can constitute evidence of a mitigating circumstance. *See* T.C.A. § 39–13–204(j)(9) (2003). Upon our thorough review of the record, we do not agree with

the Defendant's interpretation of the prosecutor's comments. The State said, "The defense *can* put on evidence . . . ." (emphasis added). This comports more with the State's contention that its comments were informing the jury of what may happen during the trial and did not shift the burden to present mitigating proof to the Defendant. We conclude that the trial court did not abuse its broad discretion when it allowed the State to tell the jury that the Defendant can present mitigating evidence.

### 2. Questioning of Prospective Jurors

#### a. Mitigating Circumstances

The Defendant contends that the trial court erroneously limited the remarks he made and questions he asked potential jurors during voir dire. First, the Defendant argues that the trial court erred when it refused to allow the Defendant to ask each potential juror what he or she considered to be a mitigating circumstance. The State responds that the trial court, in an effort to limit the defense's use of openended questions, properly required the defense to use a more narrowly tailored question to elicit the jurors' propensity for bias.

A Defendant has a right to "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *Akins*, 867 S.W.2d at 354. Therefore, a trial court "shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges." Tenn. R.Crim. P. 24(b)(1). As previously set forth, however, the scope and extent of voir dire is entrusted to the discretion of the trial court, and the trial court's rulings will not be reversed on

appeal absent an abuse of discretion. *State v. Smith*, 993 S.W.2d 6, 28 (Tenn. 1999). Merely "[r]equiring defense counsel to ask clearer, more-pointed and understandable questions is not an abuse of discretion." *State v. Jerry Lynn Walde*, No. 03C01–9603–CC–00109, 1997 WL 789964, at *6 (Tenn.Crim.App., at Knoxville, Dec. 23, 1997), *perm. app. denied* (Tenn. Jan. 4, 1999).

During voir dire, the Defendant requested permission to ask each juror to explain what he or she considered to be a mitigating circumstance of homicide. The trial court said defense counsel must ask a "more-pointed" question, requiring the Defendant to list several statutory mitigating factors and, following each factor, ask each juror whether he or she considered the factor "mitigating." In our view, the trial court's limitation was intended to extract a "clearer, more-pointed and understandable" question. *See id.* Therefore, the trial court did not abuse its discretion in this matter. *Id.*

#### b. Phrase "Put a Fellow Citizen to Death"

The Defendant next contends that the trial court erred when it prohibited him from saying that the State was seeking to "put a fellow citizen to death" because such a limitation "tends to minimize the impact of the jury's role" in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The State disagrees with the Defendant's interpretation of *Caldwell* and says the trial court did not err when it required the Defendant to say that the State was "seeking the death penalty" instead of that the State was seeking to "put a fellow citizen to death."

In *Caldwell*, the U.S. Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determi-

nation made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328, 105 S.Ct. 2633. As a result, *Caldwell* prohibits remarks that "suggest to the jury that their decision to impose the death penalty would be temporary, tentative, or conditional, depending on the review of higher courts." *McCormick v. State*, No. 03C01–9802–CR–00052, 1999 WL 394935, at *20 (Tenn.Crim.App., at Knoxville, June 17, 1999), *no Tenn. R.App. P. 11 application filed*. For example, a trial court may not instruct the jury, as the *Caldwell* trial court did, that the jury's imposition of a death sentence is not binding or valid in any sense because it is subject to appellate review. *Id.*

We conclude the trial court did not violate *Caldwell* when it required the Defendant to use the phrase "seeking the death penalty" instead of "seeking to put a fellow citizen to death." The phrase "seeking the death penalty" did not suggest to the jury that its decision to impose a death sentence was only "temporary, tentative, or conditional." *McCormick*, 1999 WL 394935, at *20. The limitation did not lessen the impact upon the jurors of the nature of their responsibility as jurors sitting on a trial where the death penalty is requested. *Id.; see Caldwell*, 472 U.S. at 328, 105 S.Ct. 2633. The trial court did not abuse its broad discretion or violate *Caldwell* when it limited the Defendant, and the Defendant is not entitled to relief on this matter. *Id.*

### 3. Excusing Prospective Jurors

■ The Defendant argues that the trial court violated his right to equal protection of the laws when it excused eleven potential jurors, all of whom were women, without giving the Defendant a chance to rehabilitate them and without making a record of its decision. The State responds that the trial court did not violate the Defendant's constitutional rights and that the trial court properly excused each of the jurors based upon each juror's explanation of how serving as a juror would be a hardship for them. The State points out that many of the female jurors were excused because they were solely responsible for the care of their small children, which has been found by other courts to be a valid reason for being excused, citing *Johnson v. United States*, 307 F.Supp.2d 380, 387 (D.Conn.2003).

Pursuant to Tennessee Code Annotated section 22–5–307(a) (2003), a person summoned for jury service must appear at the specified time and place "unless excused therefrom or discharged by the judge." In the case under submission, the prospective jurors were excused when they appeared in court based on the court's consideration of the information provided by the jurors to the trial court's inquiries. At the time of the Defendant's trial, the relevant code section provided that "any person may be excused from serving as a juror ... when, for any reason, the person's own interests, or those of the public, will, in the opinion of the court, be materially injured by the person's attendance." *See* T.C.A. § 22–1–104(a) (2003) (repealed 2009). The statute further provided that "any person, when summoned to jury duty, may be excused upon a showing that such person's service will constitute an undue hardship." T.C.A. § 22–1–104(b) (repealed 2009). Further, the law in effect at the time of the Defendant's trial provided that the "court may discharge from service a grand or petit juror ... for any other reasonable or proper cause, to be judged

by the court." T.C.A. § 22–1–105 (Supp. 2008).[1]

The Defendant in this case contends that the trial court systematically excluded women from the jury venire. Further, the Defendant states that, had this exclusion been the result of the State's use of peremptory strikes, he could have sought some recourse, but, because it was perpetuated by the trial court, he had no such recourse. The United States Supreme Court has addressed whether peremptory challenges on the basis of gender violate the Equal Protection Clause holding, "Intentional discrimination on the basis of gender by a state actor violates the Equal Protection Clause, particularly where . . . the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130–31, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The Court clarified that intention to exclude based on gender is a requirement for there to be an Equal Protection violation. Even exclusions "based on characteristics that are disproportionately associated with one gender could be appropriate, absent a showing of pretext." *Id.* at 143, 114 S.Ct. 1419. The Court then gives the example that "challenging all persons who have had military experience would disproportionately affect men at this time, while challenging all persons employed as nurses would disproportionately affect women. Without a showing of pretext, however, these challenges may well not be unconstitutional, since they are not gender or race based." *Id.* (citing *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).

According to our review of the record, during voir dire the Defendant objected stating:

> Your Honor, we had 30 jurors come today. Out of those 30 jurors for cause, there w[ere] 12 people that approached Your Honor, asking for a for-cause-excuse; Your Honor granted all of them with the exception of one, Ms. Hanes. Actually, there w[ere] 13 including Ms. Hanes. Out of the 12 of the 30, 11 were females. And, of course, females have certain problems, and the Court addressed it: Children, et cetera.
>
> I would like to take exception to the Court's ruling excluding these 11 people. Females are a recognizable class that the courts have held there should be adequate provocation before they're excused. I don't know how many remaining jurors in that 30, were females. But I do know that 11 approached Your Honor. And I know we have lost the opportunity to have at least 11 females on the jury.

In total, the trial court excused thirteen prospective jurors based upon an undue hardship before the Defendant's objection, and eleven of those thirteen jurors were female.[2] The trial court asked that the potential jurors who felt incapable of serving due to the necessary five-night sequestration to identify themselves. The trial court then called each potential juror up to the bench and had a private conversation about the person's reasons for not being

---

1. At the time of the Defendant's trial, this statute was codified at Tennessee Code Annotated section 22–1–106.

2. In the trial court's order on the Defendant's motion for new trial, it also addresses why female jurors Linda Knox, Jane Karp, Kay Pitts, Shannon Cyphers, and Joe Etta Braswell were excused. These jurors were excused after the Defendant's objection and do not seem to be the subject of this appeal. We will, therefore, not address the trial court's excusing these jurors.

able to serve by staying in a hotel for five nights. After each conversation, the trial court announced why it was dismissing that potential juror. The following occurred during the questioning of each juror:

### a. Alberta Hooks

**The Court:** So, Ms. Hooks, we'll just start with you. You want to come up here?

(Ms. Hooks complied.)

**The Court:** Yes, ma'am.

(Whereupon, a discussion took place between Ms. Hooks and the Court. And then, the following proceedings were had.)

**The Court:** She has children problems. A single parent. And thank you. Good luck to you.

**Ms. Hooks:** Thank you.

(Ms. Hooks was excused).

### b. Jennifer Miller

**The Court:** All right. We'll just start here on the front row. And your name is?

**Ms. Miller:** Miller.

**The Court:** Jennifer Miller, should be number 22

(Whereupon, a discussion took place between Ms. Miller and the Court. And then, the following proceedings were had.)

**The Court:** She has two children. No one will be able to pick them up. Okay.

(Ms. Miller was excused.)

### c. Tina Foster

**The Court:** All right. Yes, ma'am.

**Ms. Foster:** Tina Foster.

**The Court:** Yes, ma'am.

**Ms. Foster:** I've got children. My husband works all day. I just don't think the youngest one would do well, for five days, without her mamma.

**The Court:** Okay. All right. We'll excuse you then. Ms. Tina Foster. Thank you, ma'am.

(Ms. Foster was excused.)

### d. Frances Smith

(Whereupon, a discussion took place between Ms. Smith and the Court. And then, the following proceedings were had.)

**The Court:** What's your name?

**Ms. Smith:** Frances Smith.

**The Court:** This is Frances Smith. And she has two children. And no one can help but her. Right?

**Ms. Smith:** Right.

**The Court:** Okay. Ms. Smith, we'll excuse you. Thank you.

(Ms. Smith was excused.)

### e. Sandy Small

**The Court:** All right. Yes, ma'am.

(Whereupon, a discussion took place between Ms. Small and the Court. And then, the following proceedings were had.)

**The Court:** What is your name, Ms?

**Ms. Small:** Sandy Small.

**The Court:** Sandy Small. She has two children. Her husband works out of town. So we'll excuse you.

. . . .

(Whereupon Ms. Small was excused.)

### f. Dena McClellan

**The Court:** All right. Yes, ma'am.

(Whereupon, a discussion took place between Ms. McClellan and the Court. And then, the following proceedings were had.)

The Court: Her daughter graduates from high school. All right. We'll excuse you. Thank you.

(Mc. McClellan was excused.)

### g. Lou Ann Gibbs

The Court: Yes, ma'am. What's your name?

Ms. Gibbs: Lou Ann Gibbs.

. . . .

(Whereupon, a discussion took place between Ms. Gibbs and the Court. And then, the following proceedings were had.)

The Court: Her job is going to take her out of town until next week. So, thank you, ma'am.

(Ms. Gibbs was excused.)

Ms. Jack: Is that Ms. Gibbs?

The Court: Ms. Gibbs.

### h. Elizabeth Daniels

The Court: This is Elizabeth Daniels.

. . . .

(Whereupon, a discussion took place between Ms. Daniels and the Court. And then, the following proceedings were had.)

The Court: All right. Two children, 6 and 10. No one's there when they get home from school. Thank you.

(Ms. Daniels was excused.)

### i. Theresa Blocker

The Court: All right. Yes, ma'am.

(Whereupon, a discussion took place between Ms. Blocker and the Court. And then, the following proceedings were had.)

The Court: All right. A 7–year–old at home and her husband works nights. Thank you, ma'am.

(Ms. Blocker was excused.)

General Dicus: What was her name, Judge?

The Court: Theresa Blocker.

### j. Nelda Bone

The Court: All right. Yes, ma'am.

Ms. Bone: Nelda Bone.

The Court: All right. Ms. Bone is number 8.

(Whereupon, a discussion took place between Ms. Bone and the Court. And then, the following proceedings were had.)

The Court: She's across from her mother-in-law who's ill. Thank you, ma'am.

(Ms. Bone was excused.)

### k. Kimberly Sisk

The Court: Kimberly Sisk. All right. She has her grandfather. Thank you, ma'am.

(Ms. Sisk was excused.)

Upon our detailed examination of the record, the trial court excused each one of these female jurors for reasons other than gender. Each of these jurors requested to be excused and provided the trial court with reasons why serving as a juror would be an undue hardship. It is clear that the trial court acted within its discretion when it excused these jurors based upon their showing that service as jurors would constitute undue hardship. See T.C.A. § 22–1–104(b) (repealed 2009).

Further, we find no merit in the Defendant's contention that the trial court's excusing these women amounted to a systematic excusing of women from the jury venire. As previously stated, the trial court correctly applied the hardship provision of Tennessee Code Annotated section 22–1–104(b). The fact that such applica-

tion allows the trial court to excuse mothers who have no alternative methods of childcare is, as other courts have found, perhaps an inevitable result of a hardship exemption. *See Bratcher v. Commonwealth*, 151 S.W.3d 332, 345–46 (Ky.2004) (holding that a trial court's application of the hardship provision of the Kentucky statute to excuse mothers with no alternative methods of childcare was perhaps an inevitable result of a hardship exemption); *People v. Olson*, 60 Ill.App.3d 535, 18 Ill. Dec. 218, 377 N.E.2d 371, 376 (1978) (holding trial court's excusal of women who were unable to make arrangements for the care of their children was not unreasonable); *State v. Taylor*, 771 S.W.2d 387, 400 (Tenn.1989) (holding that proof did not show a systematic exclusion of women in the grand jury selection process where the trial court stated that there were no automatic exemptions granted women but that women would frequently offer compelling reasons for excusal, namely the care of young children); *see also Johnson*, 307 F.Supp.2d at 387 (holding, "Trial courts have long recognized that jurors with young children should be excused for cause when they are unable to obtain child-care for their children"); *McArthur v. State*, 351 So.2d 972, 975 (Fla.1977) (upholding the constitutionality of a Florida statute excusing from jury service pregnant women and women with small children); *State v. George*, 476 S.E.2d 903, 906–07 (S.C.1996) (holding that statutory excusals of three women with young children from jury service pursuant to "child care" exemption did not violate defendant's right to a venire pool reflecting fair cross-section of a community). We conclude that the trial court's actions in the case presently before us do not constitute the sort of "[i]ntentional discrimination on the basis of gender by a state actor" that violates the constitution. *See J.E.B. v.*

*Alabama ex rel. T.B.*, 511 U.S. at 130–31, 114 S.Ct. 1419.

#### 4. Juror Jonathan White

The Defendant argues that the trial court erred because it did not grant his motion to strike potential juror Jonathan White for cause based on Juror White's belief that life without parole was not a sufficient punishment for first degree murder. The Defendant avers that he was forced to use a peremptory strike to dismiss Juror White, which left Juror Boatwright on the panel. Juror Boatwright, the Defendant says, was incompetent to serve because, "of all the prospective jurors, she was the one whose individual voir dire was the most restricted by the court," meaning the Defendant "knew very little about her." The State counters that Juror White said he would weigh the mitigating circumstances and assign the death penalty only when the mitigation was not sufficient. Further, it asserts there is no evidence to support the Defendant's contention that Juror Boatwright was incompetent.

The Defendant points us to the following exchange between defense counsel and Juror White, which occurred after defense counsel gave Juror White a hypothetical situation where a defendant, with an abusive childhood as well as an ongoing psychiatric disorder, is charged with murdering another person:

**Q:** Would you be able to balance [the facts] out, or would that mean anything to you?

**A:** I could balance that out.

. . . .

**Q:** [I]n those facts, you hear things that tend to mitigate, or tend to soften, or tend to give a reason for the behavior or conduct of the person who's on trial.

**A:** Uh-huh (affirmative). Yes.

**Q:** Okay. And could you carry those mitigating factors with you into the jury[ ]room?

**A:** Yes, ma'am.

. . . .

**Q:** Now, [the State] touched on some other penalties which is life. And life, in Tennessee is 51 years before you could come before a board and be eligible for parole. The other, is life without the possibility of parole, which means, when they take you to the penitentiary; that's going to be the home for the rest of your life. And we've talked about the death penalty. Do you see life, 51 years in prison as a harsh punishment?

**A:** No.

**Q:** You don't think that's a harsh punishment?

**A:** No.

**Q:** What about life without the possibility of parole? Where you spend the rest of your life in a cage.

**A:** No.

**Q:** You don't think that's an adequate punishment?

**A:** No.

**Q:** So, given any of the specific set of circumstances, your inclination would be, if certain factors are met and you don't feel the mitigation is sufficient, that the only option for the punishment would be death?

**A:** Yes.

In response to the State's voir dire, the following exchange took place between the prosecuting attorney and Juror White:

**Q [the State]:** Now, if we get to . . . the punishment stage of the trial, if you found him guilty of first degree murder, the judge will tell you [there are] three possible punishments that you can consider. There's life in prison[ ], which in Tennessee, is 51 years before you're eligible for parole. Life without parole, which is just what it says, you can never be paroled. Or the death penalty. Do you think you would be able to fairly, and impartially, consider all three punishments?

**A [Juror White]:** Yes, sir.

As previously stated, both the United States and Tennessee Constitutions guarantee a criminal defendant to the right to a trial by an impartial jury. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. To that end, parties in civil and criminal cases are granted "an absolute right to examine prospective jurors" in an effort to determine that they are competent. See T.C.A. § 22–3–101 (2003). The "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); *State v. Reid,* 213 S.W.3d 792, 835–36 (Tenn.2006). "[T]his standard . . . does not require that a juror's biases be proved with 'unmistakable clarity.'" *Id.* Instead, the trial court must have the "definite impression" that the prospective juror cannot follow the law. *State v. Hutchison,* 898 S.W.2d 161, 167 (Tenn. 1994) (citing *Wainwright,* 469 U.S. at 425–26, 105 S.Ct. 844). Irrespective of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. *State v. Howell,* 868 S.W.2d 238, 248 (Tenn.1993); *State v. Thompson,*

768 S.W.2d 239, 246 (Tenn.1989). The failure to correctly excuse a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him. *Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *State v. Jones,* 789 S.W.2d 545, 549 (Tenn. 1990). Finally, the trial court's finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the defendant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. *Reid,* 213 S.W.3d at 836

Initially, we note that we do not agree with the Defendant's characterization of Juror Boatwright as incompetent. The fact that defense counsel knew little about her is insufficient to establish her incompetence, in part because defense counsel had time to conduct a complete voir dire of Juror Boatwright. There is simply no evidence in the record to find that Juror Boatwright was in any way incompetent. Accordingly, the Defendant has not proven that his jury was not fair and impartial and any error in the trial court's failure to excuse Juror White would, therefore, be considered harmless. Nevertheless, we turn to consider whether the trial court should have excused Juror White for cause.

■ After reviewing the answers and responses of Juror White, we conclude that the trial court did not err by failing to remove Juror White for cause. Juror White confirmed that he would weigh the various enhancement and mitigating factors and determine the appropriate punishment. While Juror White said that he did not think that life without the possibility of parole was an adequate punishment

for committing murder, he also said that he could fairly and impartially consider all three punishments: life with the possibility of parole; life without the possibility of parole; and a sentence of death. The Defendant has not established by convincing evidence that the trial court's determination was erroneous, and he is, therefore, not entitled to relief on this issue.

### 5. Prospective Juror Manual Oskian

■ The Defendant argues that the trial court erred when it removed Prospective Juror Manual Oskian because Oskian never said he would be biased. The State argues that the trial court properly dismissed Oskian based upon Oskian's responses that his judgment might be impaired because his co-worker's son was also on trial for murder and that he would be uncomfortable at work if he was empanelled on the jury.

During the questioning of Oskian, the following transpired:

**The Court:** And you had indicated that you worked with a person [at Saturn], whose son ... is charged with murder; is that correct?

**A [Oskian]:** He's in trial. Uh-huh (affirmative).

. . . .

**A:** In Marshall County.

. . . .

**A:** [F]or me to be working with him, his son being tried and me being here, it's kind of like trying to put me in the spot.

**The Court:** So you think it might put you in a bad situation, because—

**A:** Yes. Yes.

**Q:** —his son was at trial as we speak?

**A:** Yes, sir.

**Q:** And if you were on this jury, that might cause you some conflict with this gentleman, this person?

**A:** Yes, sir.

**Q:** Why would that be?

**A:** When you work with somebody—I don't know how to phrase it—but on an assembly line, and you work with somebody, you always communicate.

**Q:** Would it make you uncomfortable then, to sit on this jury, because of that?

**A:** I think so. I think so.

**Q:** You think it might, in some manner, affect your judgment?

**A:** It might. It might.

Later, when being asked questions by defense counsel, Oskian elaborated, saying, "[I]t would ... affect[ ] me when I[was] ... working. I have known [my coworker] for 12 years. I've worked next to him for 12 years. What's going to happen to me the next 12 years, when his trial comes up?" He then said, "Just being in this trial" would "make [him] feel uncomfortable either way" the verdict went. The trial court then excused Oskian from the jury venire.

As previously stated, a trial court may discharge from service any juror for any reasonable or proper cause, to be judged by the court. T.C.A. § 22–1–105 (Supp. 2008). Whether to excuse a juror from the venire is a matter left within the sound discretion of the trial court. *See Raspberry,* 875 S.W.2d at 681. To be entitled to relief, the Defendant would have to show that, because Oskian was excused, he was left with a jury what was not fair and impartial. *See generally, Howell,* 868 S.W.2d at 248; *Thompson,* 768 S.W.2d at 246.

Our review of the record reveals that the trial court did not abuse its discretion when it removed Prospective Juror Oskian. Oskian expressed his concern that his close relationship with his co-worker, whose son was on trial for murder, might affect his judgment in this case. Further, he said that serving as a juror would make him uncomfortable at his place of employment. The Defendant has not shown that the trial court erred by excusing Juror Oskian, and he has not shown that the jury that was empanelled was not fair and impartial. As such, he is not entitled to relief on this issue.

### C. Sufficiency of the Evidence

The Defendant argues that the evidence presented was insufficient to support his conviction for premeditated first degree murder because the evidence against him was circumstantial and did not prove that he acted with premeditation. The State counters that the circumstantial evidence, including the evidence of the Defendant's motive, sufficiently supports the jury's finding of premeditation.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *see* Tenn. R.App. P. 13(e); *State v. Goodwin,* 143 S.W.3d 771, 775 (Tenn.2004) (citing *State v. Reid,* 91 S.W.3d 247, 276 (Tenn.2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass,* 13 S.W.3d 389, 392–93 (Tenn.Crim.App.1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim.App.1990). Nor may this Court substitute its inferences for those drawn by

the trier of fact from the evidence. *State v. Buggs,* 995 S.W.2d 102, 105 (Tenn.1999); *Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn.1997); *Liakas,* 286 S.W.2d at 859. " 'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.' " *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978) (*State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State,* 219 Tenn. 4, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State,* 212 Tenn. 464, 370 S.W.2d 523 (1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin,* 143 S.W.3d at 775 (citing *State v. Smith,* 24 S.W.3d 274, 279 (Tenn.2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers,* 35 S.W.3d 516, 557–58 (Tenn.2000).

The Defendant was convicted of premeditated first degree murder. First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39–13–202(a)(1) (2001). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39–13–202(d) (2001). Whether the defendant premeditated is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland,* 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39–13–202(d). The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland,* 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder, *State v. Nichols,* 24 S.W.3d 297, 302 (Tenn.2000), and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Halake,* 102 S.W.3d 661, 668 (Tenn.Crim.App.2001) (citing *State v. Gentry,* 881 S.W.2d 1, 4–5 (Tenn.Crim.App.1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach,* 148 S.W.3d 42, 54 (Tenn.2004).

After considering the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support the jury's finding that the Defendant acted with premeditation when he killed the victim. The evidence proved that the Defendant and Sanderson were quietly talking in the Defendant's cell before this crime and that they stopped their conversation each time the Defendant's cellmate entered the cell. The two admittedly agreed to go teach the victim some "respect." They entered the victim's cell while he was quietly reading at a time that the guard would not be able to see the victim's cell. The Defendant took a sock and strangled the victim, telling his cellmate that he was surprised at how much the victim struggled. The Defendant then tore off a bloody section of his shirt, flushed the section down the toilet, and hid the rest of his bloody clothes under his bed. Shortly after the killing, the Defendant fell asleep in his cell. The Defendant told his cellmate, and later confirmed to investigators, that he killed the victim because the victim's sentence was not long enough for the crime the victim committed and because being charged with the victim's death would give him an opportunity to escape while being transported to and from court. This evidence is sufficient to support the jury's finding that the Defendant acted with premeditation when he killed the victim. He is not entitled to relief on this issue.

### G. Constitutionality of Death Penalty on Its Face

The Defendant argues that the Tennessee death penalty statute is unconstitutional on its face. Specifically, the Defendant alleges that the statute: (1) does not properly guide a jury about the standards of proof when considering whether the aggra-

vating circumstances outweigh the mitigation evidence; (2) permits the jury to give too little weight to non-statutory mitigating factors; (3) does not inform the jury of its right to impose mercy; (4) does not require the jury to actually determine that death is appropriate but rather calls for the foreperson to list aggravating and mitigating circumstances; (5) fails to inform the jury about what happens if it does not reach a unanimous verdict; (6) requires the jury to impose death if the aggravating circumstances outweigh the mitigating circumstances; and (7) allows for the introduction of relatively unreliable evidence for aggravated circumstances and for rebuttal to mitigation evidence. Also, the Defendant argues that he was prejudiced because the State presented the final closing argument and that the death penalty was imposed discriminately on the basis of his race, sex, geographic region, and economic and political status. The State argues that Tennessee courts have already reviewed and rejected these claims.

The State correctly asserts that these arguments have already been made and rejected as grounds of relief. *State v. Bush*, 942 S.W.2d 489, 524 (Tenn.1997) (citations omitted). This Court defers to, and is bound by, the rulings of the Tennessee Supreme Court. As such, the Defendant is not entitled to relief on these issues.

### H. Constitutionality of Death Penalty as Applied

The Defendant claims that Tennessee's death penalty statute is applied in a cruel and unusual manner and that it is, therefore, unconstitutional. In Tennessee, an inmate sentenced to death is administered three chemicals to carry out the imposed sentence. The lethal injection protocol was upheld by the Tennessee Supreme Court in *Abdur'Rahman v. Brede-*

*sen,* 181 S.W.3d 292 (Tenn.2005). As recently as November 2008, the Tennessee Supreme Court continued to cite *Abdur'Rahman* for the principle that the lethal injection protocol in Tennessee does not violate a defendant's Eighth Amendment right against cruel and unusual punishment. *State v. Banks,* 271 S.W.3d 90 (Tenn.2008). In addition, the United States Supreme Court recently held that Kentucky's triple-injection method of execution was constitutional and did not violate an inmate's right against cruel and unusual punishment. *Baze v. Rees,* 553 U.S. 35, 128 S.Ct. 1520, 1529, 170 L.Ed.2d 420 (2008). In that opinion, the Supreme Court further stated, "A state with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk" of severe pain when compared to known and available alternatives. *Id.* at 1537. Tennessee's lethal injection protocol has been recognized as substantially similar to Kentucky's. *Baze,* 553 U.S. 35, 128 S.Ct. at 1527 (citing *Workman v. Bredesen,* 486 F.3d 896, 902 (2007)). Thus, we conclude the Tennessee method of lethal injection is constitutional with respect to the Eighth Amendment, and the Defendant is not entitled to relief on this issue.